### IN THE UNITED STATES DISTRICT COURT
### WESTERN DISTRICT OF ARKANSAS
### EL DORADO DIVISION

**LARRY MILTON**, *et al.*,

                                             **PLAINTIFFS**,

v.     No. 1:88-CV-1142

**MIKE HUCKABEE**, *et al.*,     **DEFENDANTS.**

AND

**DOUGLAS LANCASTER**, *et al.*,

                                             **PLAINTIFFS**,

v.     No. 1:09-CV-1056

**DR. JERRY GUESS**, in his capacity
as Superintendent of Camden-
Fairview School District No. 16, *et al.*,     **DEFENDANTS.**

### BRIEF IN SUPPORT OF MOTION TO TERMINATE CONTINUED SUPERVISION

Federal court supervision of schools is an extraordinary remedy with an expiration date. Setting education policy is ordinarily left to state and local governments. But 60 years ago, with far too many school districts flouting the mandate of *Brown v. Board of Education*, the Supreme Court okayed judicial intervention to ensure desegregation. Still, the Court has made clear that judicial intervention must be limited: Courts may act only to remedy past *de jure* segregation. And as the Jim Crow era recedes further into the history books, court oversight must also become a thing of the past.

In the Camden-Fairview School District, segregation thankfully ended two decades ago. Yet to preserve a particular racial balance, a prophylactic consent decree remains on the books, preventing white children (but not black children) from transferring to a neighboring district that better meets their needs. That decree interferes with the State's chosen policy of school choice.

1

Even worse, it denies a group of schoolchildren educational opportunities solely because of their race. It is past time for this court-mandated racial discrimination to end.

I.  **Three Decades of Court Supervision over Camden-Fairview**

More than 30 years ago, a group of Ouachita County parents sued to seek consolidation of their children's local school districts, Camden, Fairview, and Harmony Grove. Complaint, No. 88-1142, Doc. 291-1. Those districts, the plaintiffs alleged, had "encouraged white flight from Camden District" by "permitting interdistrict transfers of white students for racial reasons." *Id.* ¶ 11(B).

That suit terminated in a series of consent decrees. Among other things, Camden and Fairview consolidated. Doc. 220. And Harmony Grove agreed to not accept white transfer students from the new Camden-Fairview without Camden-Fairview's permission. Doc. 262-1 at 2.

In 2002, Camden-Fairview was declared unitary and nearly all consent decrees were terminated. Doc. 254. But "to prevent future 'white flight,'" the Court's final order left in place the prohibition on white transfers to Harmony Grove. *Id.* ¶ 10. It also forbade Harmony Grove from accepting as transfers the white children of its employees, though doing so was allowed by state law. *Id.*

Several years later, Camden-Fairview approved the transfer of children from an influential white family to Harmony Grove—while simultaneously rejecting another white child's transfer application. Complaint, No. 09-1056, Doc. 2. That child's family sued, alleging equal protection violations. *Id.* This second suit terminated with another settlement agreement that tightened the Court's grip: now, no white children can transfer to Harmony Grove without a court order. Doc. 19.

When Camden-Fairview and Harmony Grove first agreed to bar white transfers, that restriction tracked state law: a 1989 school-choice act provided that no student could transfer to a

district with a higher "percentage of enrollment for the student's race." Act 609 of 1989, sec. 11(a).

But the law has changed. In 2007, the Supreme Court reaffirmed that schools cannot tell "schoolchildren . . .where they [can] and [cannot] go to school based on the color of their skin." *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 747 (2007). A few years later, a court in the Western District of Arkansas held that, under *Parents Involved*, Arkansas's 1989 "white flight" restriction violated the Fourteenth Amendment and invalidated it. *Teague ex rel. T.T. v. Ark. Bd. of Educ.*, 873 F. Supp. 2d 1055 (W.D. Ark. 2012). Even if most white students would "'choice out' to 'whiter' schools," a "fear of [that] 'white flight' [could] not, in and of itself, justify the overbroad restriction[] on school transfer." *Id.* at 1067-68. Arkansas revoked that unconstitutional race-based transfer restriction the next year. *See Teague v. Cooper*, 720 F.3d 973, 975-76 (8th Cir. 2013).

More recently, the State has adopted broad school-choice policies letting *any* student "apply for admission . . . in *any* school district." Ark. Code Ann. 6-18-1901(b)(3) (emphasis added) (findings). Yet to avoid conflicting with the judicial power, the current school choice law acknowledges that contrary desegregation orders still govern. *Id.* 6-18-1901(b)(3), -1906(a). Consequently, white children residing in the Camden-Fairview School District remain unable to partake of the same educational opportunities as their peers.

## II. Arkansas Has an Interest in Protecting Camden-Fairview Schoolchildren from Race Discrimination

More than a year ago, the Eighth Circuit signaled that it's time for Camden-Fairview's transfer restrictions to end. In related school-choice litigation, that court noted that decades-old desegregation orders, including Camden-Fairview's, "raise[] red flags" and advised this Court to "hold a unitary status hearing and consider removing these cases from the federal docket." *United*

3

*States v. Junction City Sch. Dist.*, 14 F.4th 658, 668 (8th Cir. 2021) (internal quotation marks omitted).

Despite that admonition, Camden-Fairview indicated in a recent letter to the Arkansas Department of Education that it has no plans to pursue termination. *See* Letter to ADE, Ex. A at 3. That flouts the Eighth Circuit's directive. Camden-Fairview's desire to "prevent future 'white flight'" and preserve a particular racial balance cannot justify the consent decree's race-based transfer provision. *See infra* Part III.A. Because there is no ongoing *de jure* segregation, the time to relinquish judicial control has come. *See infra* Part III.B.

Since Camden-Fairview will not move to defend its schoolchildren, the State of Arkansas must. Bound by the Supremacy Clause to defend the federal Constitution, Arkansas has "significant sovereign interests" in preventing "violations of [the] constitutional rights of its citizens." *Pennsylvania v. Porter*, 659 F.2d 306, 316 (3d Cir. 1981). Moreover, the State bears the heavy responsibility of ensuring that *all* children in Arkansas have an adequate education. Ark. Const. art. 14, sec. 1. It need not wait for Camden-Fairview to act or for a frustrated parent (with significantly fewer resources) to sue before pursuing legal remedies allowing it to fulfill its constitutional obligations. *Porter*, 659 F.2d at 315-16.

The State informed Camden-Fairview's counsel of its plans to seek termination of the transfer restriction on February 14 and March 13. *See* Letter to Counsel, Ex. B.

**III.    Camden-Fairview's Transfer Restriction Racially Discriminates and Must End**

Motions to terminate consent decrees or declare a school district unitary typically require some showing of changed circumstances. *See, e.g.*, *Cody v. Hillard*, 139 F.3d 1197, 1199 (8th Cir. 1998) (test for termination); *Freeman v. Pitts*, 503 U.S. 467 (1992) (test for unitary status). But this case is unique: Camden-Fairview *already* showed circumstances had changed 20 years ago. Indeed, this Court found all parties "fully compli[ant]" with the consent decrees and held that the

4

"racially dual system of education . . . had been dismantled and eliminated." No. 88-1142, Doc. 254 ¶ 6. It did not find that Camden-Fairview or its neighbor, Harmony Grove, had further work to do. *Cf. Freeman*, 503 U.S. at 496-97 (explaining the typical justification for partial retention of judicial oversight).

At that point, this Court should have terminated all judicial supervision. Instead, it let the parties leave the transfer restriction in place as a prophylactic measure "to prevent *future* 'white flight'" that might have a "segregative impact." Doc. 254 ¶ 10 (emphasis added). In other words, this Court allowed the parties to restrict future "private choices" that might undermine their desired racial balance. *Freeman*, 503 U.S. at 495.

That choice was legally dubious in 2002 and is patently unconstitutional today. And at any rate, the time for judicial management of Camden-Fairview has expired. This Court should return control over Camden-Fairview schools to policymakers and parents. *Cf. Bryant v. Woodall*, 2022 WL 3465380, at *2 (M.D.N.C. Aug. 17, 2022) (terminating injunction that contradicts Supreme Court precedent because "[n]either this court, nor the public, nor [the parties] have the right to ignore the rule of law as determined by the Supreme Court").

A. **The Constitution Forbids Camden-Fairview's Racial Balancing**

Racial classifications are "pernicious." *Gratz v. Bollinger*, 539 U.S. 244, 270 (2003). The Fourteenth Amendment promises all Americans equal treatment, regardless of their race or ethnic background. *Id.* Policies departing from this fundamental principle must survive the most searching review. *Parents Involved*, 551 U.S. at 720.

For grade schools, very few discriminatory policies can survive. The Supreme Court has confirmed only one "compelling interest" justifying consideration of race: "remedying the effects of past intentional discrimination." *Id.* But that interest is narrow; it is limited to undoing "unlawful *de jure* polic[ies]" causing "racial imbalance." *Freeman*, 503 U.S. at 494. By contrast,

5

"[w]here resegregation is a product not of state action but of private choices"—such as voluntarily transferring to another district—"it does not have constitutional implications" and does not necessitate remediation. *Id.* at 495; *see also Missouri v. Jenkins*, 515 U.S. 70, 115 (1995) (Thomas, J., concurring) ("The mere fact that a school is black does not mean that it is the product of a constitutional violation."). Once a school district has eliminated "the vestiges of prior segregation," any "use of race must be justified on other grounds." *Parents Involved*, 551 U.S. at 725 n.12 (plurality op. of Roberts, C.J.). Because Camden-Fairview long ago dismantled segregation and because the transfer restriction targets non-state action, that restriction is not remedial.

Beyond that, the Supreme Court has left open the possibility that racial diversity *may* be a compelling interest—but categorically rejected the type of crude racial categorization present here. In *Parents Involved*, Justice Kennedy split from a four-Justice plurality over whether schools could pursue diversity for its own sake. *Compare id.* at 730-31 (Roberts, C.J.) (rejecting racial proportionality as a compelling end), *with id.* at 788-89 (Kennedy, J., concurring in part and concurring in judgment) (approving diversity, broadly defined, as a compelling interest). But even Justice Kennedy believed that race should be only "one component of that diversity," not the sole inquiry. *Id.* at 798. And a five-Justice majority agreed that schools could not "classify students by race and rely upon that classification in making school assignments," *id.* at 711 (majority op.), at least unless that classification was a "last resort to achieve a compelling interest." *Id.* at 790 (Kennedy, J.).

Camden-Fairview's transfer restriction fails under this diversity rationale too. It refuses to consider students holistically but simply sorts them into "black" and "white" groups and assigns educational opportunities accordingly. *See id.* at 740-41 (Roberts, C.J.) (discussing *Grutter*'s

6

approval of a holistic approach); *id.* at 791 (Kennedy, J.) (approving "a more nuanced, individual evaluation of school needs and student characteristics that might include race"). And it fails to justify that classification as a necessary "last resort." Thus, it is patently unconstitutional.

### B. Precedent Indicates that Judicial Management Must End Now

This Court should terminate the transfer restriction because it is unconstitutional. *See supra* Section III.A. It should terminate the restriction for another reason too: The restriction is a prophylactic measure designed to prevent future *de facto* resegregation. But without ongoing *de jure* segregation, courts can't monitor a school district for all time. After three decades of judicial management, it's time for policymakers to retake control of Camden-Fairview. *Junction City Sch. Dist.*, 14 F.4th at 668.

Allowing courts to supervise school desegregation was an extraordinary remedy necessary to overcome districts' intransigence. *Freeman*, 503 U.S. at 503-05 (Scalia, J., concurring) (tracing the history of desegregation remedies). But when state-sponsored violations cease, so must judicial management. Indeed, the Supreme Court has instructed district courts to withdraw supervision as much as possible. For instance, the Court endorsed a district court's decision to revisit and partly terminate a desegregation order a school had complied with for 17 years with few complaints. *Id.* at 473, 496 (majority op.). And it cautioned future courts against presuming that any racial imbalance in school districts "once *de jure* segregated" necessitated "ongoing and never-ending supervision." *Id.* at 495. Instead, it noted that "[a]s [a] *de jure* violation becomes more remote in time," it's less likely that any "racial imbalance . . . is a vestige of the prior *de jure* system." *Id.* at 496. Without a clear link between *de jure* and *de facto*, continued supervision would be improper.

Courts view other race-focused remedies with a similarly skeptical eye. Take "race-conscious admissions policies." *Grutter*, 539 U.S. at 342. Though the Supreme Court okayed

affirmative action in higher education in 2003, it predicted that "25 years from [then], the use of racial preferences [would] no longer be necessary." *Id.* at 343. Indeed, two decades later, it's reconsidering the permissibility of affirmative action. *See Students for Fair Admissions v. Univ. of N.C.*, No. 21-707 (U.S.); *Students for Fair Admissions v. President & Fellows of Harv. College*, No. 20-1199 (U.S.). Similarly, the Eighth Circuit has explained that "affirmative action consent decrees are not favored unless they are temporary and will terminate when the manifest [racial] imbalances have been eliminated." *Brotherhood of Midwest Guardians, Inc. v. City of Omaha*, 9 F.3d 677, 680 (8th Cir. 1993) (internal quotation marks omitted) (alteration in original).

Or consider the Voting Rights Act. Back in the Civil Rights Era, the VRA's "stringent" requirement that certain jurisdictions obtain preclearance before amending their election laws was "justified" by the ongoing "blight of racial discrimination in voting." *Shelby Cnty. v. Holder*, 570 U.S. 529, 545 (2013) (internal quotation marks omitted). But that "extraordinary legislation was intended to be temporary, set to expire after five years." *Id.* at 546. When Congress instead extended the preclearance provision to apply for *sixty-five years*—long after "[t]hings ha[d] changed in the South"—the Supreme Court declared the provision unconstitutional. *Id.* at 540, 549 (internal quotation marks omitted). To the extent any "racial discrimination in voting" persisted, the remedy had to "speak[] to current conditions," not a Jim Crow era long past. *Id.* at 557.

For the same reasons, this Court should end its supervision over Camden-Fairview and terminate the transfer restriction. This Court found Camden-Fairview unitary two decades ago. Indeed, no plaintiff has alleged ongoing segregation in over 30 years. At most, the parties and this Court worried two decades ago that allowing transfers would make Camden-Fairview a disproportionately minority school. But to justify managing the district "30 years after the last

8

official state action," this Court "must do more than show that" Camden-Fairview has a large minority "population." *Jenkins*, 515 U.S. at 118 (Thomas, J., concurring). And as none of the parties can make such a showing, the Court must remove Camden-Fairview's "case[] from the federal docket." *Junction City*, 14 F.4th at 668.

## Conclusion

The Constitution prohibits race discrimination—whether it targets minorities who have faced discrimination in the past or the white majority. Camden-Fairview's transfer restriction denies certain white children the school-choice option that Arkansas grants all other children, white or black, across the State. This Court should end that discrimination today.

Dated: March 15, 2023

Respectfully Submitted,

TIM GRIFFIN
  Arkansas Attorney General

*Nicholas J. Bronni*
NICHOLAS J. BRONNI (Ark. Bar No. 2016097)
  Arkansas Solicitor General
DYLAN L. JACOBS (Ark. Bar. No. 2016167)
  Deputy Solicitor General
HANNAH L. TEMPLIN (Ark. Bar. No. 2021277)
  Assistant Solicitor General
ARKANSAS ATTORNEY GENERAL'S OFFICE
323 Center Street, Suite 200
Little Rock, AR 72201
Phone: (501) 682-6302
Fax: (501) 682-2591
Email: Nicholas.Bronni@arkansasag.gov
       Dylan.Jacobs@arkansasag.gov
       Hannah.Templin@arkansasag.gov

*Attorneys for Arkansas*