## IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF ARKANSAS

| | |
|---|---|
| **LARRY MILTON, et al.** | **PLAINTIFFS** |
| **v.**        **CASE NO. 1:88-CV-01142-SOH** | |
| **MIKE HUCKABEE, et al.** | **DEFENDANTS** |

**AND**

| | |
|---|---|
| **DOUGLAS LANCASTER, et al.** | **PLAINTIFFS** |
| **v.**        **CASE NO. 1:09-CV-01056** | |
| **DR. JERRY GUESS, in his capacity as** **Superintendent of Camden-Fairview** **School District No. 16, et al.** | **DEFENDANTS** |

### CAMDEN-FAIRVIEW SCHOOL DISTRICT'S BRIEF IN SUPPORT OF RESPONSE TO THE STATE'S MOTION TO TERMINATE CONTINUED SUPERVISION

## I.      INTRODUCTION

The State's Motion is predicated on four false premises: first, that passage of time is a sufficient reason to terminate a consent decree; second, that the law which governs termination of a consent decree has changed; third, that the Camden-Fairview School District (hereafter, "Camden-Fairview" or "CFSD") is seeking "to preserve a particular racial balance"; and fourth, that the restriction on transfers of white students to Harmony Grove School District (hereafter, "Harmony Grove" or "HGSD") is not aimed at a vestige of segregation. The State acknowledges that "[m]otions to terminate consent decrees. . . typically require some showing of changed circumstances," but it points to no evidence of changed circumstances, and seeks to avoid its burden of proof by arguing that "this case is unique." State's Br., p. 4, citing *Cody v. Hillard*, 139 F.3d 1197, 1199 (8th Cir. 1998).

1

This case is not unique. It was brought to remedy the all-too-common problem of interdistrict segregation. *United States v. Junction City Sch. Dist.*, 14 F.4th 658, 663 (8th Cir. 2021) ("*Junction City II*"). The Complaint was filed by plaintiffs whose proposed remedy for the inter-district segregation they experienced was consolidation of all three school districts which then existed in the City of Camden: Camden,  Fairview, and Harmony Grove. *Id.*  Following the consolidation of the Camden and Fairview school districts in 1990, HGSD agreed, as a remedy for its interdistrict segregation, to refuse the transfer of white students from Camden-Fairview without CFSD's permission. *Id.* at 663-64. Camden, Fairview and Harmony Grove reaffirmed that requirement in a 2001 settlement agreement. *Id.* at 664.

When the Eighth Circuit reviewed the desegregation orders of four south Arkansas school districts in 2020 and 2021, it acknowledged that the Camden-Fairview consent decree, unlike the others, "explicitly resolves problems related to interdistrict transfers." It cannot be terminated simply because it conflicts with the State's goal of unlimited school choice, and is therefore "no longer convenient to live with." *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 383 (1992). As will be shown in more detail below, the State lacks standing to bring its motion, but even if that were not the case, the State has failed to identify a sufficient basis on which to terminate the Consent Decree.

## II.    BACKGROUND

**The 1990 Consent Order**

On November 27, 1990, this Court entered a consent order upon the request of the plaintiffs, Camden School District, Fairview School District, and Harmony Grove School District. The order addressed the previous consolidation of Camden and Fairview and imposed requirements on Harmony Grove regarding the racial composition of HGSD's school board, the

2

creation of election zones for the HGSD board that complied with the Voting Rights Act and, at issue here, rules for student transfers between HGSD and the newly-consolidated CFSD. Specifically, HGSD agreed to (1) "maintain an open admission policy in regard to non-resident [CFSD] black students;" and (2) "not permit the transfer of white students from [CFSD] into [HGSD] without the written permission of Fairview." November 27, 1990 Consent Order, ¶ 1(C). The order further directed HGSD to "refrain from engaging in any other act or conduct tending directly or indirectly to have a segregative impact in the Fairview School District." *Id*. CFSD and HGSD also agreed to "refrain from adopting student assignment plans or programs that have an interdistrict segregative effect on either district." *Id*.

**The 2001 Settlement and 2002 Consent Decree**

On December 10, 2001, a Settlement Agreement was reached by the State of Arkansas, the Arkansas Department of Education, CFSD, HGSD, the City of Camden, and the Housing Authority of Camden. Among other things, that Agreement reiterates the requirement that HGSD "generally refrain from any action having a segregative impact within CFSD. Specifically, HGSD was to maintain an open admission policy for nonresident black students and was prohibited from accepting the transfer of nonresident white students into HGSD without the written consent of CFSD." *See* 2001 Settlement Agreement, ¶ 3.

The 2001 Settlement Agreement continued and expanded the transfer prohibition, and explained the reasons for doing so:

> The provisions of Paragraph 1(C) of the consent order of November 27, 1990, in regard to HGSD shall remain in full force and effect to prevent future "white flight" from CFSD to HGSD. In addition, existing state law permits the attendance of nonresident children at a school district where those children's parents are employees of the school district. A.C.A. § 6-18-203. Where this statute is applied to permit the attendance of white children resident in CFSD at HGSD, it has a segregative impact upon CFSD. Such attendance should, therefore, be declared violative of Paragraph 1(C) of the above consent order

unless said attendance is with the written consent of CFSD. The declaration of unitary status sought herein should otherwise have the result of dismissing with prejudice HGSD from this litigation.

2001 Settlement Agreement, ¶ 10.

The February 1, 2002 Consent Order was prepared by the State of Arkansas, the Arkansas Department of Education, the Camden Fairview School District and the Plaintiffs. That Consent Order incorporates "word for word" "[t]he terms and conditions of the parties' Settlement Agreement dated the 10th day of December, 2001."

**The 2010 Lancaster Decision**

On July 26, 2010, this Court issued an order in *Lancaster v. Guess*, No. 09-CV-1056, U.S. Dist. Ct., W.D. Ark., granting the joint motion of the parties to dismiss the case based on their settlement agreement. Because the complaint in *Lancaster* had "raised issues related to the remedial desegregation provisions established and applied to [CFSD] and HGSD in case No. 88-142," this Court had previously granted CFSD's motion to add HGSD as a party to the *Lancaster* case. This Court found and concluded "that the remedial provisions set forth in Paragraph 1(C) of the November 27, 1990 consent order, and Paragraph 10 of the February 1, 2002 [Settlement Agreement] remain in full force and effect at this time." The Court retained  jurisdiction to enforce its orders in the *Lancaster* case and this one.

**The Eighth Circuit Junction City Decisions**

***Junction City I***

Following significant changes to Arkansas's public school choice laws, this Court allowed Camden-Fairview and three other school districts to modify their consent decrees to exempt themselves from provisions of Arkansas law which would otherwise have allowed segregative student transfers. In a two to one decision, a panel of the Eighth Circuit Court of Appeals at first

affirmed that decision. *United States v. Junction City Sch. Dist.*, 984 F.3d 608, 613 (8th Cir. 2020) ("*Junction City I*").

Prior to 1989, Arkansas law did not allow students to easily transfer from their resident school district to a nonresident school district. *Id*. at 613-14. In 1989, the legislature enacted a school choice law which allowed students to apply to a nonresident school district, but prohibited transfers where the percentage of enrollment for the students' race exceeded that percentage in his or her resident district. *Id.*

The 1989 law was replaced in 2013 by a school choice law which "allowed for students to transfer to nonresident school districts but did not permit segregative transfers." *Id.* at 614. School districts could declare themselves exempt from participation in school choice, however, if participating would conflict with an existing desegregation plan or order. *Id.*

The law changed again in 2015 to require a school district seeking an exemption to submit proof to the Arkansas Department of Education of an active desegregation order or plan. *Id.* In 2017, the legislature further restricted a school district's ability to limit segregative interdistrict transfers. The 2017 amendments required districts seeking exemptions to submit proof of a desegregation plan or order "that explicitly limits the transfer of students between school districts." *Id.*, citing Ark. Code Ann. § 6-18-1906 (2017).

This Court found, and the Eighth Circuit agreed, that the changes in Arkansas school choice law from 1989 to 2017 amounted to a significant change in the law:

> We agree that the laws influencing consent decrees have clearly changed since the Districts entered into the [consent] agreements. Had Arkansas law not prohibited interdistrict transfers when the decrees were enacted, it is likely that the Department of Justice would have required that language similar to the district court's modification be included in the agreements.

*Id.* at 615-16.

The first *Junction City* panel opinion pointed to strong evidence in the record that segregative transfers continued as vestiges of the former dual education system in south Arkansas school districts:

- "Multiple superintendents with decades of experience in southern Arkansas schools testified that white flight would be a problem in Junction City…".

- "All fifteen students requesting interdistrict transfers in Camden-Fairview were from non-black students."

- "Of the 70 interdistrict transfer requests from students in Hope, 68 of them were from non-black students."

- "But for the actions of other school districts denying applications, Hope could have lost 3% of its non-black student body, the maximum allowed under Arkansas law, in its very first year of school choice participation."

- "Both school years Lafayette County participated in school choice, Lafayette County lost the maximum 3% of its non-black student body allowed under the law, or very close to it."

- During the 2013-2014 school year, it [Lafayette County] lost over 30 of its students to interdistrict transfers. Each one of the transferring students was white."

- During the 2018-2019 school year, after its application for an exemption from school choice was denied, 35 students requested interdistrict transfers. Once again, each one of the transferring students was white."

*Id.* at 616-17. The record before the Eighth Circuit in 2020 and 2021 made plain that Arkansas's 2017 school choice law would predictably lead to increased segregation.

### Junction City II

The Arkansas Department of Education, later joined by the United States Department of Justice, asked the Eighth Circuit to reconsider its opinion in *Junction City I. Junction City II*, 14 F.4th at 661. Following supplemental briefing, the same panel in another two to one decision issued a *Per Curiam* order reversing this Court and its own prior decision.

The *Junction City II* panel began its analysis with a discussion of a court's remedial power with respect to vestiges of a dual education system:

> While school districts and states must "eliminate all vestiges of a dual system," for a "vestige" to support an exercise of remedial authority, it must be traceable to the dual system. Accordingly, when determining what remedial authority a court has, first principles dictate that "[a] remedy is justifiable only in so far as it advances the ultimate objective of alleviating the initial constitutional violation."

*Id.* at 666 (internal citations omitted). The panel then distinguished Camden-Fairview from the other three Plaintiff school districts on the basis that Camden-Fairview's consent decree was the only one which addressed interdistrict constitutional violations. *Id.* at n. 3 and n. 4. The Court found that "school transfers would be a new problem for the [other three] school districts," so there was no underlying constitutional violation to justify a limitation on interdistrict transfers: "There is no 'vestige' of discrimination that has anything to do with school transfers." *Id.* at 667. The Court concluded that, "[b]ecause no vestige of discrimination traces to interdistrict school transfers, the district court abused its discretion in expanding the consent decrees to prohibit such transfers." *Id.* at 667.

With respect to CFSD, however, the *Junction City II* panel noted that "[t]he plaintiffs explicitly brought the case 'to remedy interdistrict segregation'" and "sought consolidation of the Camden, Fairview and Harmony Grove school districts." *Id.* at 663. In 1990… the Camden and Fairview School Districts (but not Harmony Grove) were consolidated," even though "Harmony Grove [was] the only school district alleged to have engaged in unconstitutional conduct that affected the racial composition of Camden Fairview's student body." As a remedy for its interdistrict segregation, Harmony Grove agreed "to refuse 'the transfer of white students from' Camden Fairview without its permission." *Id.* at 663-64.  "[T]he provision of the consent decree regarding Harmony Grove's transfer policy remain[s] in full force and effect." *Id.* at 664.  Unlike

FEC/45907.0002/9881819.1-4/27/23

the other three districts in the case, there is a "vestige of discrimination" with respect to Harmony Grove and Camden Fairview which "traces to interdistrict school transfers." *Id.* at 667.

In 2001, the parties, including the State of Arkansas and the Arkansas Department of Education, "entered a settlement agreement declaring that [Camden-Fairview] had achieved unitary status." That settlement agreement required that the consent decree regarding Harmony Grove's transfer policy would remain in full force and effect. *Id.* at 664.

Following the enactment of the 2017 amendments to the Arkansas school choice law, all four of the *Junction City* appellee districts applied for exemptions for the 2018-2019 school year. *Id.* at 665. All were denied except that Camden-Fairview was granted partial exemption based on its consent decree which restricted the transfer of white students from Camden-Fairview to Harmony Grove. *Id.* Since "no party challenge[d] the partial exemption that Camden-Fairview received with respect to Harmony Grove," the *Junction City II* panel decided to "ignore that issue" as it considered the consent decrees in the other three districts which were related only to intradistrict constitutional violations.  *Id.* at 666-67 and n.3.

After deciding the issue at hand, the panel noted its "concerns about these desegregation orders continuing in place." *Id.* at 668. "Camden Fairview has been (*for the most part*) declared unitary; the only provision still in effect today is a consent provision prohibiting transfers to Harmony Grove." *Id.* (*emphasis supplied*). The panel noted that the consent decrees in the other three districts had been "dormant" for decades. "Given all this," the panel said, " it may be wise for the district court to hold a unitary status hearing to consider removing these cases from the federal docket." *Id.*

The majority opinion in *Junction City I* became the dissent in *Junction City II*, including the discussion of "segregative issues stemming from the State's inaction in the face of white

8

flight," and the record established before the district court of "segregative interdistrict transfers."

*Id.* at 669.

### *Teague v. Arkansas Board of Education*

The *Junction City* case was preceded by *Teague v. Ark. Bd. of Educ.*, 873 F.3d 2nd, 1055

(W.D. Ark. 2012) *vacated as moot sub nom. Teague v. Cooper*, 720 F.3d 973 (8th Cir. 2013).

*Teague* is another case in which the record established before the district court showed the racial

impact of unrestricted school choice:

> For the entire State of Arkansas in the 2010-2011 school year, 15,682 students were enrolled in receiving districts under some form of choice transfer. This represents 3.35% of the total elementary and secondary student body in the State. Of those participating in some form of choice transfer in the 2010-2011 school year, 75.97% (11,913 students) were white students and 17.18% (2,694 students) were black. For comparison, there were 468,066 students enrolled in publicly funded education in the State. Roughly two-thirds (65.03% or 304,373 students) in the public schools in the State in 2010-2011 were white and 21.34% (99,862 students) were black.

*Id.* at 1067. These numbers, even though they reflect all school choice transfers and not just those

from majority black schools to majority white schools, nevertheless showed that white students

were participating in choice transfers at a significantly greater rate than their black peers.

This numerical evidence was supplemented by the testimony of experienced educators. Dr.

Jerry Guess, former superintendent of CFSD and then-superintendent of the Pulaski County

Special School District, said that "removing residence and race restrictions would rapidly result in

many counties in Arkansas having a racially segregated public school system as white students

'choice out' to 'whiter' schools." *Id.*

Robert Watson, then-superintendent of the El Dorado School District, testified "that race

trumps all other considerations, including quality of education, in his county among most white

parents selecting a school district for their child to attend." *Id.* Watson believed that if the Arkansas

Public School Choice Act of 1989 had not included a racial restriction, "El Dorado would have very quickly lost its white students and become an overwhelmingly black school district." *Id.*

### III.    ARGUMENT

**A.    The State Does Not Have Standing to Terminate the Consent Decree**

The State has been dismissed from this case and has no continuing obligations. Perhaps that is why it includes in its brief an argument that Arkansas has "significant sovereign interests" to protect in this case.  State's Br., § II, pp. 3-4. That argument, which is based entirely on a forty-year-old Third Circuit case (*Pennsylvania v. Porter*, 659 F.2d 306 (3d Cir. 1981)), is unavailing.

 The *Porter* case involved police misconduct.  The Commonwealth of Pennsylvania and several individuals alleged that a police officer, "with the instigation, acquiescence and ratification of the Mayor and Council, engaged in an extended pattern or practice of conduct denying persons lawfully in Millvale their constitutional rights to be free from physical violence, mistreatment, threats, harassment, illegal detention, illegal arrests, and illegal searches and seizures." *Id.* at 309. The court described the myriad of problems created by "[m]isconduct of local government officials," and the Commonwealth's interest in preventing those problems.

The Commonwealth put forth several reasons "it should not be forced to rely upon the happenstance of suits by individual victims of constitutional violations": first, that "many individual victims may be unable to show the likelihood of future violations of their rights, and will be relegated to damages actions only." *Id.* at 315.  Second, "the burden of going forward with investigation and litigation of any action seeking injunctive relief against a pattern or practice of police misconduct is substantial, and not likely to be within the resources available to the typical victims of such misconduct." *Id.*  While the court noted that "[b]y virtue of the supremacy clause, the Commonwealth has the same interest in compliance with the standard of conduct laid down in

the fourteenth amendment as it has in compliance with standards of conduct enacted by the Pennsylvania legislature," there was no countervailing constitutional interest asserted by the defendants in that case. *Id.*

The *Porter* case is unlike this one. *Porter* involved sprawling allegations of police misconduct and a pattern and practice of constitutional violations among government officials. The likelihood that an individual Plaintiff could obtain an injunction was small, and the cost of investigation and litigation necessary to attempt to do so would have been "substantial". *Id.*

A recent case from the Eastern District of Louisiana more closely resembles this one.  In *Harrison v. Jefferson Parish Sch. Bd.*, 2022 U.S. Dist. LEXIS 31453, the district court held that the State of Louisiana could not continue to intervene in a case involving student discipline issues because "[t]he State's asserted interest in this case is 'too vague to survive the standing requirements of Article III.'"  *Id.* at *40, *quoting Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 602 (1982).

The *Jefferson Parish* case involved the discipline of two Jefferson Parish School Board students, both of whom sued JPSB.  The State of Louisiana was granted leave to intervene in both cases.  *Id*. at *8.  The two students settled their separate cases against JPSB, and the court dismissed their claims with prejudice.  *Id*.  at *10. JPSB then moved for judgment on the pleadings with respect to the State's complaint in intervention (*Id*. at *11-*12) arguing that the State lacked standing to pursue constitutional issues related to student discipline.  *Id*.  at *12-*15.

The State resisted the motion:

> "[T]he State argues that it is has standing to assert claims for violations of its citizens' constitutional rights.  The State contends that the State may bring a *parens patriae* action to assert the rights of its citizens.  The State argues that it has a  quasi-sovereign interest  in "assuring that the benefits of federal law and

civil rights are not denied to its general population," and that this interest exists "apart from the interests of private parties."

*Id.* at *17-*18.

The State further argued that "'JPSB has a policy, practice, or custom' of violating students' rights, and thus the State has an interest in ensuring compliance with state and federal law that is independent of the [student] plaintiffs' claims for relief." Finally, the State asserted that JPSB had "a long history of constitutional and civil rights violations" sufficient to establish "a pattern, practice or policy of such violations." *Id.* at *17-*18.

The court noted that the "burden is on the party invoking jurisdiction to establish the existence of a case or controversy," by showing that it has suffered "injury in fact," that there is a causal connection between the injury and the conduct complained of, and that the injury will be redressed by a favorable decision. *Id.* at *24-*25 (internal citations omitted). After reviewing the case law, the court determined that "the State can maintain the suit as a *parens patriae* action if it (1) can articulate a "quasi-sovereign interest" in the litigation that is separate from the interests of the original private plaintiffs and (2) alleges injury to a sufficiently substantial segment of the population." *Id.* at 30.

After considering the quasi-sovereign interests argument, the court concluded that the State's asserted interest was insufficient to confer standing:

> Although here the State asserts general interest in protecting its citizens' rights, the State does not identify any case in which the *parens patriae* doctrine was invoked in circumstances similar to those here, much less any binding precedent in the Fifth Circuit. Instead, the State relies on a forty year old Third Circuit case, as well as district court cases from other circuits, for the general proposition that states can bring suits for injunctive relief to protect their citizens' constitutional rights. But those cases similarly arose in quite different contexts and, as explained more below, involve a State suing to prevent harms to its citizens broadly. Absent some authority applying the *parens patriae* doctrine in a similar context, the State's mere invocation of an interest in

protecting its citizens is "too vague to survive the standing requirements of Article III."

*Id.* at \*34, *quoting Snapp*, 458 U.S. at 602.  The court also concluded that "the State ha[d] not met its burden of alleging injury to a 'sufficiently substantial segment' of the population,"  granted JPSB's motion for judgment on the pleadings, and dismissed the State's case.  *Jefferson Parish*, at \*34, \*40-\*41.

Here, there is already a consent decree in place which impacts a limited number of students in two school districts. The state's interest is not in protecting its citizens as in *Porter*, but in enforcing its "broad school-choice policies" in every corner of the state, including where those policies are barred by existing desegregation orders. State's Br., p.3.

Arkansas's asserted interest in this case is even more vague than the interest asserted by Louisiana in *Jefferson Parish*. *See* State's Br., p. 4. ("Since Camden-Fairview will not move to defend its schoolchildren, the state of Arkansas must."). Tracking *Porter*, the State argues that "Arkansas has 'significant sovereign interests' in preventing 'violations of [the] constitutional rights of its citizens.'"  *Id.*, *quoting Porter*, 659 F.2d at 316.

Not only does Arkansas invoke an interest in protecting its citizens that is "too vague to survive the standing requirements of Article III" (*Jefferson Parish* at \*34, *quoting Snapp*, 458 U.S. at 602), the State has also failed to allege any injury to a substantial portion of the population. *Jefferson Parish* at \*34. For these reasons, the State lacks standing to pursue its motion in this case.

**B.**     **Standard for Terminating a School Desegregation Consent Decree and Burden of Proof**

The State's declaration that this case is "unique" is a poor attempt to hide the fact that it has not presented evidence sufficient to justify termination of a consent decree. The Supreme Court

has held that a district seeking to terminate a consent decree must show that it has "complied in good faith with the desegregation decree since it was entered, and [that] the vestiges of past discrimination have been eliminated to the extent practicable." *Freeman v. Pitts*, 503 U.S. 467, 492 (1992).

A movant's burden to terminate a consent decree "because the party subject to the decree has fully complied with its obligations," is significantly higher than the burden necessary for modification of a consent decree "'when changed factual conditions make compliance with the decree substantially more onerous . . . when a decree proves to be unworkable because of unforeseen obstacles . . . or when enforcement would be detrimental to the public interest.'" *Smith v. Bd. of Ed. of Palestine-Wheatley Sch. Dist.*, 769 F.3d 566, 572 (8th Cir. 2014), *quoting Rufo*, 502 U.S. at 384; *see also*, *Davis v. Hot Springs Sch. Dist.*, 833 F.3d 959, 963-964 (8th Cir. 2016)(discussing standards for modification or termination of a consent decree due to changed circumstances).  Therefore, if the State is allowed to remain in the case and proceed to the merits on its motion to terminate, as the moving party the State must bear the burden of proof, must show that CFSD and HGSD have fully complied with the terms of the 2002 consent order, and must establish such compliance by presenting evidence correspondent to the factors set forth in *Cody*. It has not done so, and its motion should therefore be dismissed.

The decision to terminate jurisdiction over a consent decree is within the district court's discretion. *Cody*, 139 F.3rd at 1199. The Eighth Circuit in *Cody,* however, counseled district courts to consider a number of factors, at least four of which are relevant to this case: (1) "any specific terms providing for continued supervision and jurisdiction over the consent decree; (2) the consent decree's underlying goals;… (5) the length of time the consent decree has been in effect. . .; and (6) the continuing efficacy of the consent decree's enforcement." *Id*.

14

C.      Discussion

1.      **The State Has Not Met Its Burden of Proof and Termination Must Be Denied**

The State's Brief can be read as suggesting that this Court should proceed promptly and without a hearing to declare that the Camden Fairview consent decree is "patently unconstitutional" and must be terminated. Even if the Court finds that the State has standing to pursue its motion, that motion should be dismissed unless the State can show that it has evidence sufficient to meet its burden of proof for terminating a consent decree.

The State relies heavily on the Eighth Circuit panel's decision in *Junction City II*, but the court there simply suggested that "it may be wise for the district court to hold a unitary status hearing and consider removing these cases [presumably Camden Fairview, Junction City, Lafayette and Hope] from the federal docket. *Junction City II*, 14 F.4th at 668. Contrary to the State's assertion that the Eighth Circuit issued a "directive" that Camden Fairview somehow "flouts" by declining "to pursue termination" of its consent decree, the Eighth Circuit did not direct Camden-Fairview to do anything, and certainly did not suggest that Camden-Fairview's consent order could be terminated without a hearing. *Id.* (stating that "it may be wise for the district court to hold a unitary status hearing. . .".).

A.      ***The Cody factors and Freeman standard both favor continuation of the consent order.***

The State made no attempt to address the *Cody* factors, stating without citation that "the time for judicial management of Camden-Fairview has expired." State's Br., p. 5. In any event, the *Cody* factors weigh in favor of Camden-Fairview. There are specific terms in the consent decree, which have been revisited several times, and which provide for continued supervision and jurisdiction over that decree. The underlying goals of the decree, primarily the avoidance of segregative interdistrict transfers, would be jeopardized by termination of the decree. The consent

decree has been in place a long time, but it remains efficacious and capable of enforcement. There is no basis under *Cody* for terminating the decree.

The State has also not shown that "'the vestiges of past discrimination have been eliminated to the extent practicable,' the core of the termination standard in *Freeman*, which authorizes courts to relinquish continuing jurisdiction to ensure compliance with a desegregation consent decree when the moving party has demonstrated full compliance." *Smith*, 572. A vestige of *de jure* segregation "is a current or latent racial imbalance that is 'traceable, in a proximate way, to the prior violation' of the Fourteenth Amendment." *Hampton v. Jefferson County Bd. of Educ.*, 102 F. Supp. 2d 358, 361 (W.D. Ky. 2000), *quoting Freeman*, 503 U.S. at 494. "The vestiges of segregation that are the concern of the law in a school case may be subtle and intangible but nonetheless they must be so real that they have a causal link to the *de jure* violation being remedied." *Freeman*, 503 U.S. at 496. Those vestiges remain in this case and, because the State has failed to present evidence to the contrary, termination of the 2002 Consent Order would be "supported by nothing more than the notion [it is] 'no longer convenient to live with.'" *Davis*, 833 F.3d at 964, *quoting Smith*, 769 F.3d at 574 (internal quotations omitted). For these reasons, the State has failed to identify a sufficient basis to terminate the consent decree.

**B.     *The transfer prohibition is not an attempt to achieve "racial balance" – it is a vestige of the former system that has not been eliminated, fully or to a practicable extent.***

The State also glosses over the importance of the transfer prohibition, which it describes as this Court "let[ting] the parties leave the transfer restriction in place," (State's Br., p. 5), as though the continuation of the transfer prohibition was merely an afterthought. In doing so, the State dismisses the importance of the transfer prohibition to the original decree, relegating it as secondary to other constitutional issues, and ignores the evidence that white flight remained a problem at the time the 2002 Consent Order was entered (and, in fact, thereafter). Upon closer

review of the 2002 Consent Order, it is apparent that the Court's unitary status findings applied to the consolidated Camden-Fairview's efforts to eliminate the racially dual system that existed between the former Camden and Fairview districts. It was therefore unexceptional for this Court to find CFSD in "total compliance" regarding these intra-district obligations, while simultaneously continuing judicial oversight of student transfers between CFSD and HGSD. This Court's incremental release of supervision comports with *Freeman*:

> in the course of supervising desegregation plans, federal courts have the authority to relinquish supervision and control of school districts in incremental stages, before full compliance has been achieved in every area of school operations . . . Among the factors which must inform the sound discretion of the court in ordering partial withdrawal are the following: whether there has been full and satisfactory compliance with the decree in those aspects of the system where supervision is to be withdrawn; *whether retention of judicial control is necessary or practical to achieve compliance with the decree in other facets of the school system*; and whether the school district has demonstrated, to the public and to the parents and students of the once disfavored race, its good-faith commitment to the whole of the court's decree and to those provisions of the law and the Constitution that were the predicate for judicial intervention in the first instance.

*Id*. at 490-91 (*emphasis added*).

The record in this case reveals actual reason to be sure that the unitary status finding did not apply to interdistrict transfers between CFSD and HGSD, despite the use of phrases such as "full compliance." No evidence was presented at the unitary status hearing that the districts had achieved unitary status with respect to interdistrict issues, and indeed the 2001 Settlement Agreement expanded the scope of the prohibition on interdistrict transfers between the districts.

The timeline of the settlement agreements and orders entered over the years makes clear that interdistrict transfers remained a problem after the original consent decree was entered in 1990. That order, entered November 27, 1990, required HGSD to maintain an open admission policy for non-resident Black students and to prohibit the transfer of white students from CFSD

into HGSD without CFSD's "written permission." The 2001 Settlement Agreement and 2002 Consent Order, while terminating the State's payment obligations and finding CFSD "unitary" by virtue of its having "materially reduced the test score disparity between black and white students within the district" (Order, ¶ 2), expanded the transfer prohibition by prohibiting HGSD employees residing in CFSD from enrolling their children as students at HGSD without CFSD's written consent, as such transfers were found to have a further segregative impact upon CFSD.

The *Lancaster* case, filed in 2009, again addressed and expanded the transfer prohibition by requiring court approval of future transfers of students residing in CFSD whose parents were employed at HGSD. It is apparent from this timeline that the 1990 order made it more difficult for white students to transfer from CFSD to HGSD, because after that date a transfer required CFSD's permission. Nevertheless, white flight continued to be possible from 1990 through 2001, as parents exploited the loophole found in the statute allowing school employees to enroll their children in the district at which they were employed; when the 2002 order closed this loophole by requiring CFSD's consent for such enrollments, additional litigation later ensued because CFSD gave consent in some cases and not in others, resulting in the current status, in which a white CFSD student whose parent is employed by HGSD may only enroll with the consent of this Court.

The State overlooks the fact that CFSD students have – and do exercise – other options for transferring to other schools: Black CFSD students remain entitled to attend HGSD through the original consent order's provision requiring HGSD to maintain an open admission policy; white students whose parents are not employed by HGSD may transfer between the districts with the consent of both school boards; white students whose parents are employed at HGSD may obtain Court permission to transfer to HGSD; and all students may apply for school choice transfers to any school district other than HGSD without CFSD's consent. While the State contends no hearing

FEC/45907.0002/9881819.1-4/27/23

is necessary, CFSD is aware of discoverable information regarding transfer requests it has received since the entry of the *Lancaster* order, the segregative impact of such transfers, and the segregative impact of school choice transfers to other districts.

CFSD has no desired "racial balance," as the State contends. State's Br., p. 4. Its desire, and constitutional obligation, is to end segregation and all of its vestiges. It is well established that "government bodies, including courts, may constitutionally employ racial classifications essential to remedy unlawful treatment of racial or ethnic groups subject to discrimination." *United States v. Paradise*, 480 U.S. 149, 166 (1987). Thus, a race-based remedy is appropriate when implemented to correct a vestige of segregation. When white flight has been documented as a vestige of *de jure* segregation, as it has in this case, a race-based transfer prohibition does not preserve "racial balance"; it prohibits the unconstitutional conduct from perpetuating.

The State's contention that the transfer restriction is not remedial because "Camden-Fairview long ago dismantled segregation and . . . the transfer restriction targets non-state action" is unworthy of credence given the actual history and facts of this case. The transfer prohibition was implemented because of action by HGSD, a subdivision of the state, and this Court has never found that the vestiges of segregation related to white flight from the former Camden district to HGSD has been remedied. Instead, over the last ten years (if not since entry of the Decree in 1990) Camden-Fairview has monitored (and notified HGSD of) attempts by white CFSD residents to enroll their students illegally in HGSD.

### 2. The State Did Not Request Modification of the Consent Order and There Has Been No Significant Change in the Law that Would Warrant Modification

This Court has recognized that "[a] consent decree must of course be modified if, as it later turns out, one or more of the obligations placed upon the parties has become impermissible under federal law." *Davis*, 833 F.3d at 964, *quoting Rufo*, 502 U.S. at 388. The standard set forth in *Rufo*

19

may apply to modification of school desegregation decrees. *See, Smith*, 769 F.3d at 571 ("The Wheatley plaintiffs' contention that *Rufo* does not apply to school desegregation cases is without merit"). Desegregation orders may be modified under Fed. R. Civ. P. 60(b)(5) if the moving party shows that (1) there has been a "significant change in facts or law" that "warrants revision of the decree" and (2) "that the proposed modification is suitably tailored to the changed circumstance." *Junction City II*, 14 F.4th at 663, *citing Parton v. White*, 203 F.3d 552, 555 (8th Cir. 2000) (*per curiam*) *quoting Rufo*, 502 U.S. 367. Still, under Rule 60(b)(5), "a party may obtain relief from a court order [only] when 'it is no longer equitable that the judgment should have prospective application,' not when it is no longer convenient to live with the terms of the consent decree." *Rufo*, 502 U.S. at 383.

The State does not request modification and argues, however, not that the law has changed, but that "this Court should have terminated all judicial supervision" "20 years ago." State's Br., pp 4-5. The State contends that the consent decree concerning student transfers between Camden Fairview and Harmony Grove "was legally dubious in 2002 and is patently unconstitutional today." Relying on Supreme Court cases which were decided 30 years ago (*Freeman v. Pitts*, 503 U.S. 467 (1992); *Missouri v. Jenkins*, 515 U.S. 70 (1995)) and those which concerned *voluntary* desegregation efforts (*Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701 (2007); *Gratz v. Bollinger*, 539 U.S. 244 (2003)), the State argues that "[t]his Court should terminate the transfer restriction because it is unconstitutional." Cases such as *Freeman* and *Jenkins*, which were decided before the Consent Order in this case, obviously have not changed the law with respect to that Order.  And cases which apply constitutional law to voluntary desegregation efforts have no application here.

In support of the argument that "the time for judicial management of Camden-Fairview has expired," the State cites *Bryant v. Woodall*, 2022 WL 3465380 (M.D.N.C. Aug. 27, 2022). In *Bryant*, the district court dissolved an injunction which was based on *Planned Parenthood v. Casey*, 505 U.S. 833 (1992) and *Roe v. Wade*, 410 U.S. 113 (1973) after the decision in *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022) overruled those cases. *Id.* at *3 None of the parties in the *Bryant* case even argued that the injunction remained legally enforceable following the decision in *Dobbs*. *Id.* at *6. That is far from the case here. There has been no significant change in the law which governs termination of consent decrees. The Eighth Circuit has said, as recently as 2021, that Camden-Fairview's Consent Order "explicitly resolves problems related to interdistrict transfers," is "still in effect today," and that Camden-Fairview has been declared unitary "for the most part," not completely. *Junction City II*, 14 F.4th at 667, Note 4, 668. The State has failed to show a significant change in circumstances that warrants termination of the 2002 Consent Order and its prohibition on segregative interdistrict transfers, and its motion should be denied.

### 3. The State is Contractually Bound to the Consent Decree

The State of Arkansas was a party to the 2001 Settlement Agreement in this case and is contractually bound by that agreement and the correspondent 2002 Consent Order.  "The Eighth Circuit has recognized on numerous occasions that the parties' settlement documents are contracts that bind them to discharge the obligations contained in those agreements." *Little Rock Sch. Dist. v. Pulaski Cty. Special Sch. Dist.*, 237 F. Supp. 2d 988, 1034 (E.D. Ark. 2002), *citing LRSD v. PCSSD*, 83 F.3d 1013, 1017 (8th Cir. 1996).  The Eighth Circuit has characterized settlement documents in a desegregation case as "a particularization of federal law applicable to these parties."  *LRSD v. PCSSD*, 237 F. Supp. at 137, *quoting Knight v. PCSSD*, 112 F.3d 953, 955 (8th

Cir. 1997).   The Eighth Circuit has also "referred to 'the terms of the settlement agreement [becoming] the law of the case.'"   *Id.* at 137-38, *citing LRSD*, 131 F.3d at 1258.

The contractual obligations undertaken in the form of desegregation settlement agreements and consent orders can have significant consequences.   Parties may voluntarily agree, for example, to undertake obligations beyond those mandated by the Constitution.   *LRSD*, 237 F. Supp. 2d at 138.   And even though a school district seeking to relieve itself of its desegregation obligations normally has the burden of proof, the parties to the Pulaski County desegregation case agreed that the burden would be on any party challenging LRSD's "substantial compliance" with its desegregation obligations, and the district court upheld that agreement.   *Id.* at 138-140.

Here, the very agreement which freed the State from its continuing obligations in this case also limited the transfer of white students from CFSD to HGSD.   The State agreed to that.   It should be bound by that agreement.   *Id.*

**Conclusion**

The State has not shown that it has standing to pursue its motion, or that circumstances have changed, or that the relevant law has changed.   The State has put forth no evidence to show that it can meet its burden of proof under the standard for terminating or for modifying a consent decree. The State's motion should be denied with prejudice.

Respectfully submitted,

Whitney F. Moore (Ark. Bar No. 2009193)
WHITNEY F. MOORE, P.A.
23 Huntington Road Little Rock, AR 72227
Telephone: (870) 818-5490
Email: whitney@aprobertslaw.com

– AND –

FEC/45907.0002/9881819.1-4/27/23

Christopher Heller (Ark. Bar No. 81083)
FRIDAY, ELDREDGE & CLARK
400 West Capitol, Suite 2100
Little Rock, Arkansas 72201 3493
Telephone:  (501) 370-1506
Email:       heller@fridayfirm.com

*Attorneys for Defendant Camden-Fairview School District*

23