UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
EL DORADO DIVISION

LARRY MILTON, et al. PLAINTIFFS

v. Case No. 1:88-cv-01142-SOH

MIKE HUCKABEE, et al. DEFENDANTS

and

JESSE CASTLEBERRY and
RACHEL CASTLEBERRY PLAINTIFFS IN INTERVENTION

v.

CAMDEN FAIRVIEW
SCHOOL DISTRICT NO. 16 DEFENDANT IN INTERVENTION

# BRIEF IN SUPPORT OF MOTION FOR RELIEF FROM CONSENT DECREE

## I. Introduction

Even though Arkansas law grants every public-school student an unqualified right to transfer from the school district in which they reside to any other school district, consent decrees entered by the Court in this case deny that right to some students in defendant Camden Fairview School District No. 16 ("Camden Fairview") on the basis of race. Under those consent decrees, white students in Camden Fairview cannot exercise their statutory right under Arkansas law to transfer to the Harmony Grove School District ("Harmony Grove"). By its terms, this transfer prohibition does not remedy existing *de jure* segregation or even the vestiges of it. Rather, the transfer prohibition exists to "prevent future white flight" from Camden

Fairview, a purpose now recognized as unconstitutional under *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701 (2007), a case decided five years after entry of the consent decree.

This motion arises from Camden Fairview's use of the consent decrees to deny a transfer to Harmony Grove that Jesse Castleberry and Rachel Castleberry ("Castleberrys") requested for their daughter, Emma. The Castleberrys sought the transfer because they are alumni of Harmony Grove with long-standing ties to that district, where their mothers work. Yet Camden Fairview denied the Castleberrys' transfer request for their daughter to go to school where both her grandmothers work because of this Court's consent decrees, particularly the transfer prohibition. And the Arkansas State Board of Education refused to hear an appeal of that denial because of the consent decrees. The only forum where the Castleberrys can seek a remedy for this deprivation of their constitutional rights is this Court. The Castleberrys thus ask the Court to set aside the unconstitutional provision of the consent decrees denying the right to an interdistrict transfer to some Camden Fairview students on the basis of race because an intervening change in the law makes continued application of the transfer prohibition inequitable under Fed. R. Civ. P. 60(b)(5).

## II. Statement of Facts

This motion requires an examination of both the history of this case, which was originally filed in 1988, and Camden Fairview's treatment of the Castleberrys' request for a transfer, which occurred in 2025.

### A.1. The plaintiffs' desegregation action culminated in the consent decree restricting the transfer of white students from Camden Fairview to Harmony Grove for the purpose of preventing "future white flight."

In 1988, a group of parents sued for consolidation of the Camden, Fairview, and Harmony Grove School Districts in Ouachita County. The lawsuit was premised in part on an allegation that the Fairview and Harmony Grove districts "encouraged white flight from the Camden District" through "a number of methods," including "permitting interdistrict transfers of white students for racial reasons." Doc. 1 at ¶ 11(B).[1]

As a result of the lawsuit, Camden and Fairview consolidated to form Camden Fairview. Doc. 220 at 1–2. And the parties entered into a series of consent decrees governing various issues in the case. One of those consent decrees entered in November 1990 provided that "Harmony Grove shall not permit the transfer of white students from Fairview without the written permission of Fairview." Doc. 262-1 at 2. That transfer prohibition aligned with existing state law prohibiting interdistrict transfers for students who would transfer to a district with a higher "percentage of enrollment for the student's race." Act 609 of 1989, § 11(a).

On February 1, 2002, the Court declared Camden Fairview unitary and terminated almost all the consent decrees that had been entered in the case. Doc. 254. But the Court incorporated the terms of a settlement agreement providing that the "provisions of paragraph 1(C) of the consent order of November 27, 1990, in regard to [Harmony Grove] shall remain full force and effect ***to prevent future***

[1] Unless otherwise specified, references to the docket in this brief are to the docket in Case No. 1:88-cv-01142.

***'white flight'***" from Camden Fairview to Harmony Grove. Doc. 254 at 9–10 (emphasis added). The same provision also prohibited Harmony Grove from accepting the transfers of white children whose parents worked for Harmony Grove even though Arkansas law permitted transfers on that basis. *Id*.

Later, Camden Fairview allowed children from a prominent white family to transfer to Harmony Grove but rejected another white child's transfer request. The parents of the child denied a transfer responded by filing the *Lancaster* lawsuit, No. 1:09-cv-01056-SOH, alleging equal protection violations.[2] *Lancaster* later ended with an order of this Court keeping the restriction on the transfer of white students from Camden Fairview to Harmony Grove with the modification that any transfer of white students from Camden Fairview to Harmony Grove be approved by the Court. Doc. 262-5 at 1–2.

In 2012, this Court ruled that under *Parents Involved*, the 1989 school-choice law's "white flight" restriction violated the Fourteenth Amendment and was therefore invalid. *Teague ex rel. T.T. v. Ark. Bd. of Educ.*, 873 F. Supp. 2d 1055 (W.D. Ark. 2012). Camden Fairview intervened in *Teague* to defend—unsuccessfully—the race-based classification in the 1989 law. Arkansas responded to the *Teague* ruling by revoking the unconstitutional race-based transfer provision of its school-choice law. *Teague v. Cooper*, 720 F.3d 973, 975-76 (8th Cir. 2013).

[2] Intervenor Rachel Castleberry was the student whose denied transfer gave rise to the *Lancaster* case.

Current Arkansas law permits interdistrict transfers of any student to any school district. Ark. Code Ann. § 6-18-1901(b)(3). That broad allowance for interdistrict transfers is tempered by a provision stating that if the school-choice law's provisions conflict with "an enforceable desegregation court order or a district's court-approved desegregation plan, either of which explicitly limits the transfer of students between school districts, the provisions of the order or plan shall govern." Ark. Code Ann. § 6-18-1906(a). Accordingly, even though current Arkansas law generally permits interdistrict transfers for any student, the consent decree entered in this case continues to prohibit white children to transfer from Camden Fairview to Harmony Grove.

### A.2. Camden Fairview applied the transfer prohibition to deny the Castleberrys' requested transfer for their daughter.

On February 18, 2025, the Castleberrys applied for a transfer for their daughter, Emma, who was scheduled to begin kindergarten at Camden Fairview in the fall of 2025. Ex. 1, Castleberry Dec., at 1, ¶ 2; Ex. A to Ex. 1, Transfer Request. Harmony Grove's school board authorized the transfer request, meaning that only Camden Fairview's approval was required for the transfer to happen. Ex. 1 at 2, ¶ 8.

The Castleberrys made the transfer request for several reasons that they presented to the Camden Fairview school board at a meeting held on March 18, 2025. First, both of Emma's grandmothers work at Harmony Grove, where one grandmother works in administration and the other is a teacher. Emma's attendance at Harmony Grove thus eased the burden of transporting Emma to and

from school. Ex. 1 at 2, ¶ 4. Second, beyond Emma's grandmothers working at Harmony Grove, the Castleberrys have strong ties to Harmony Grove. *Id*. at 2, ¶ 5. Both the Castleberrys graduated from Harmony Grove, and three preceding generations of Rachel Castleberry's family graduated from Harmony Grove. *Id*. The elementary school library in Harmony Grove is named after Emma's great-great-grandmother. *Id*. Rachel Castleberry even taught at Harmony Grove for three years. *Id*. Third, the Castleberrys believed that Harmony Grove, with its stronger rankings in various education metrics, offered a stronger education for Emma. *Id*. at 2, ¶ 6.

None of the Castleberrys' reasons for seeking the transfer of Emma from Camden Fairview to Harmony Grove were for the sort of "racial reasons" that motivated the filing of the *Milton* complaint in 1988. Ex. 1 at 2, ¶ 7. Nor is there any ongoing *de jure* segregation in Camden Fairview or Harmony Grove justifying a race-based classification like the transfer prohibition. And Camden Fairview did not deny the request on those grounds, either. Rather, Camden Fairview rejected the transfer based on this Court's orders. Ex. 1 at 3, ¶ 11; Ex. B to Ex. 1. Camden Fairview's March 20, 2025, letter to the Castleberrys about the rejection of the request informed them that they could appeal the decision to the Arkansas State Board of Education. Ex. 1 at 3, ¶ 10.

The transfer request was denied on the basis of Emma's race. Ex. 1 at 3, ¶ 11. Emma is white, and the transfer prohibition in this Court's orders prohibits the interdistrict transfer of white students from Camden Fairview to Harmony Grove

because of concern about "future white flight." If Emma were not white, her transfer request would have been approved.

On March 27, 2025, the Castleberrys notified Camden Fairview that they were appealing the denial of the transfer request to the Arkansas State Board of Education ("Board"). Ex. 1 at 3, ¶ 12. The Board set the appeal to be heard at a meeting scheduled for May 8, 2025. *Id.* Camden Fairview moved to dismiss the Castleberrys' appeal of the denial of their transfer request, arguing that the Court's orders in *Milton* and *Lancaster* prohibited the transfer of Emma from Camden Fairview to Harmony Grove and that the Board lacks jurisdiction to construe those orders. *Id.* at 3, ¶ 13. The Board agreed with Camden Fairview and notified the Castleberrys on May 5, 2025, that it could not hear the appeal as scheduled because the Board "does not have jurisdiction to construe whether a local school district is in compliance with a court order." *Id.* at 3, ¶ 14; Ex. C to Ex. 1. Because the Board refused to hear the Castleberrys' appeal based on this Court's orders, their only recourse was to seek relief from those orders in this Court. Ex. 1 at 3, ¶ 15.

## III.
## Argument

The application of the transfer prohibition in the 2002 consent decree to deny the Castleberrys a transfer based on Emma's race is unconstitutional under current law, which does not allow a school district that has been declared unitary to make school assignment decisions based on race for non-remedial purposes. That current law derives from *Parents Involved*, a landmark case decided after entry of the consent decree. That change in the law justifies modification of the consent decree

to terminate the unconstitutional transfer prohibition and to permit Emma to exercise her statutory right under Arkansas law to transfer to Harmony Grove.

### A. The Court has discretion to modify or terminate the consent decree because of a significant change in circumstances, which includes an obligation becoming illegal under the law.

Fed. R. Civ. P. 60(b)(5) allows relief from a court order when "applying it prospectively is no longer equitable." In the context of institutional reform litigation like school desegregation actions,[3] this standard applies flexibly. Flexibility is necessary "because such decrees often remain in place for extended periods of time," increasing "the likelihood of significant changes occurring during the life of the decree." *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 381 (1992) (citation omitted). Such flexibility in considering requests for relief from a decree is also necessary "because such decrees reach beyond the parties involved directly in the suit and impact on the public's right to the sound and efficient operation of its institutions." *Id.* (internal quotation marks and citations omitted). Indeed, institutional decrees "affect more than the rights of the immediate litigants." *Cleveland Firefighters for Fair Hiring Pracs. v. City of Cleveland*, 669 F.3d 737, 741 (6th Cir. 2012).

Under *Rufo*, a party seeking relief from a consent decree bears the initial burden of showing "that a significant change in circumstances warrants revision of the decree." *Rufo*, 502 U.S. at 383. That significant change may lie either in

---

[3] The *Rufo* standard for modifying consent decrees applies to school desegregation decrees. *Smith v. Bd. of Educ. of Palestine-Wheatley Sch. Dist.*, 769 F.3d 566, 571 (8th Cir. 2014).

changed factual conditions or in the law. *Id.* While the Court has discretion in this area, "a consent decree must of course be modified if, as it later turns out, one or more of the obligations placed upon the parties has become impermissible under federal law." *Id.* at 388. Moreover, modification might prove necessary "if the parties had based their agreement on a misunderstanding of the governing law. *Id.* at 390.

The Eighth Circuit has characterized *Rufo's* language regarding modification of consent decree terms that have become unlawful as a "categorically stated" requirement that courts set aside such illegal terms. *City of Duluth v. Fond du Lac Band of Lake Superior Chippewa*, 702 F.3d 1147, 1153 (8th Cir. 2013) (agency determination that terms of consent decree between city and Indian tribe violated Indian Gaming Regulatory Act required modification of consent decree). As the Supreme Court said in *Agostini v. Felton*, 521 U.S. 203 (1997), "the court cannot be required to disregard significant changes in law . . . if it is satisfied that what it has been doing has been turned through changed circumstances into an instrument of wrong." *Id.* at 215.

*Rufo* also requires a party seeking a modification in a consent decree to show that the requested modification is "suitably tailored to the circumstances." *Smith*, 769 F.3d at 573. The scope of the modification may be broad because the Court may go so far as to "relieve the moving party of a consensual commitment that was essential to the original decree. Thus, a court has the power to order a changed-circumstances modification that effectively terminates the decree." *Id.*

**B. A significant change in circumstances warrants revision of the consent decree because the transfer prohibition is no longer permissible under federal law.**

Because it makes an unconstitutional race-based classification, the transfer prohibition in the Camden Fairview consent decree has become "an instrument of wrong," one that has become impermissible under federal constitutional law since the transfer prohibition was first adopted as part of a provisional consent decree in 1990. That change was marked by the Supreme Court's decision in *Parents Involved*, which held that school districts may not voluntarily adopt measures that base student assignments on race unless those measures can survive strict scrutiny. Under that standard, the transfer prohibition in the 2002 consent decree is now unconstitutional.

**B.1. *Parents Involved* changed the law in a case factually similar to this one.**

Though *Parents Involved* consolidated cases involving school districts in Seattle, Washington, and Jefferson County, Kentucky, it is the latter school district that is relevant here. Like Camden Fairview, Jefferson County had been involved in a desegregation lawsuit. 551 U.S. at 715. In 1973, a district court found that Jefferson County had maintained a segregated school system, and a desegregation decree followed two years later. *Id.* After Jefferson County operated under the decree for 25 years, the district court entered an order in 2000 finding that Jefferson County had achieved unitary status. *Id.* The next year, Jefferson County voluntarily adopted a "race-conscious student-assignment plan" to increase black student enrollment at each of the district's non-magnet elementary schools to between 15% and 50% of the school's total enrollment. *Id.* at 716.

Under that plan, each student was assigned a "resides" school based on their geographic area, and elementary resides schools were "grouped into clusters in order to facilitate integration." *Id.* at 717. Parents of kindergartners, first graders, and new students were allowed to designate a first and second choice within their cluster, while those who chose not to designate preferences were assigned within the cluster. *Id.* Assignment decisions were based on both available space in a particular school and the race of the student. *Id.* When a school reached the "extremes of the racial guidelines," students would be denied assignment to that school if their "race would contribute to the school's imbalance." *Id.* After initial assignments were made, students could apply for transfers to other non-magnet elementary schools. *Id.* Such transfers could be "requested for any number of reasons," and they could be denied on the basis of the child's race if it would upset the racial balance mandated by the plan. *Id.*

Crystal Meredith fell victim to Jefferson County's plan when she moved into the district in August 2002 and enrolled her son, Joshua McDonald in kindergarten. 551 U.S. at 717. Joshua's resides school was a mile from his new home, but it was full because assignments had been made months earlier. *Id.* Jefferson County assigned Joshua to a school ten miles from his home, so Meredith requested a transfer to a third school that, like Joshua's resides school, was only a mile from his home. *Id.* Even though space was available at the third school, Jefferson County denied the transfer because it "would have an adverse effect on desegregation compliance" at that school. *Id.* In other words, Joshua was denied a transfer

because of his race. Meredith sued Jefferson County, alleging that its race-based assignment plan violated the Equal Protection Clause of the Fourteenth Amendment. *Id.* The district court rejected the claim, finding that "Jefferson County had asserted a compelling interest in maintaining racially diverse schools, and that the assignment plan was (in all relevant respects) narrowly tailored to serve that compelling interest." *Id.* at 717–18.

After the Sixth Circuit affirmed that ruling without issuing an opinion, the Supreme Court reversed. Applying strict scrutiny review, the Supreme Court noted that it had recognized in the past that "remedying the effects of *past* intentional discrimination" is a compelling government interest that might justify racial classifications in some instances. 551 U.S. at 720 (emphasis added). Even though Jefferson County was "previously segregated by law" and had been subject to a desegregation decree, the district court presiding over that case had declared the school district unitary. *Id.* at 721. Because Jefferson County was unitary, it did "not rely upon an interest in remedying the effects of past intentional discrimination in defending its present use of race in assigning students." *Id.* "Nor could it," continued the Supreme Court, because "the harm being remedied by mandatory desegregation plans is the harm that is traceable to segregation." *Id.* So "once Jefferson County achieved unitary status, it had remedied the constitutional wrong that allowed race-based assignments." *Id.* After that point, "any continued use of race must be justified on some other basis." *Id.*

This issue of "some other basis" marked a split between the justices in *Parents Involved*. While four justices altogether rejected pursuit of racial proportionality as a compelling end, Justice Kennedy did not favor a categorical prohibition, opting instead to advocate in a concurrence that diversity might be a compelling interest in which race could be but "one component of that diversity," not the only factor. 551 U.S. at 797–98 (Kennedy, J., concurring). And in no circumstance, Justice Kennedy concluded, could a school make assignments simply on the basis of race: "Crude measures of this sort threaten to reduce children to racial chits valued and traded according to one school's supply and another's demand." *Id*. at 798 (Kennedy, J., concurring).

That *Parents Involved* marked a significant change in the law is clear. As one of the successful petitions for certiorari pointed out, the Supreme Court previously had "never decided a case involving a school district's voluntary use of race-based pupil assignments for any purpose than remediation of the effects of past *de jure* segregation." Pet. for a Writ of Cert., 2006 WL 1579631, at **8–9 (Jan. 18, 2006). And the lack of clear guidance on that point had resulted in a circuit split that created "uncertainty and confusion" in the lower courts over whether race-based assignments were permissible. *Id*. at 14–15. The decision thus resolved that circuit split by making clear that such race-based classifications in school assignments violate the Equal Protection Clause.

As might be expected when the Supreme Court addresses an issue for the first time, commentators on the case recognized *Parents Involved* as a landmark

decision marking an important development in the law. *See, e.g.*, Tammy Harel Ben Shahar, *Race, Class, and Religion: Creaming and Cropping in Religious, Ethnic, and Cultural Charter Schools*, 7 Colum. J. Race & L. 1, 69 (2016) ("In the 2007 landmark *Parents Involved* decision, the Supreme Court struck down two programs designed by boards of education to promote racial diversity that explicitly used race as a factor in student assignment."); A. Lane Morrison, *Equalizing the "Great Equalizer": The Alabama Accountability Act and the Quest to Find A Model for Education Improvement Through Choice*, 66 Ala. L. Rev. 1169, 1186–87 (2015) ("Moreover, the Supreme Court's decision in the landmark *Parents Involved* case limits a state's ability to further racial diversity by using race as the deciding factor in public school assignments."); Joseph O. Oluwole, *Revisiting Parents Involved v. Seattle Sch. District: Race Consciousness and the Government-Speech Doctrine*, 43 Golden Gate U. L. Rev. 393, 394 (2013) ("This is important, given that *Parents Involved* is the landmark Supreme Court decision on race-conscious measures at the K-12 school level.").

Many school districts also recognized that *Parents Involved* marked a change in the law and responded by implementing "new student assignment plans that adopt a race-neutral approach" because they recognized that the case prohibited consideration of race. Kimberly Jenkins Robinson, *The Constitutional Future of Race-Neutral Efforts to Achieve Diversity and Avoid Racial Isolation in Elementary and Secondary Schools*, 50 B.C. L. Rev. 277, 281 (2009).

*Parents Involved* thus marked precisely the sort of change in the law that justifies modifying a consent degree under Fed. R. Civ. P. 60(b)(5). The Court should therefore consider whether the transfer prohibition in the 2002 consent decree is now impermissible under federal law and whether relief from that requirement is warranted.

### B.2. Under *Parents Involved*, the transfer prohibition in the 2002 consent decree is now impermissible because it violates the Equal Protection Clause of the Fourteenth Amendment by denying students like Emma privileges under the law based on their race.

The transfer prohibition for white students in Camden Fairview cannot survive strict scrutiny, a standard that "has proven automatically fatal" in most cases. *Missouri v. Jenkins*, 515 U.S. 70, 121 (1995) (Thomas, J., concurring). That transfer prohibition differs little from the Jefferson County assignment plan invalidated under strict scrutiny in *Parents Involved*. Like Jefferson County, Camden Fairview was under court supervision as part of a desegregation lawsuit but had achieved unitary status. Doc. 254. And like Jefferson County, Camden Fairview voluntarily adopted a policy that classified students on the basis of race for the purpose of deciding where they could go to school.

The primary factual distinction between the two school districts is that Camden Fairview incorporated its voluntary policy into a consent decree that the Court entered in 2002. But that distinction hardly constitutes a meaningful difference—a consent decree is, of course, voluntary. And this consent decree is doubly voluntary because it incorporates by reference a settlement agreement that adopted the transfer prohibition initially imposed in the November 1990 consent

order. Doc. 254 at 9–10. The incorporation of a racial classification into a consent decree does not shield that classification from strict scrutiny. *See Cleveland Firefighters*, 669 F.3d at 741 ("Racial classifications in consent decrees are subject to strict scrutiny just like any other."). In other words, Camden Fairview cannot avoid strict scrutiny by cloaking a constitutional violation in a consent decree.

Most importantly, the transfer prohibition adopted in the consent decree is like the Jefferson County assignment plan invalidated in *Parents Involved* because it was *never* remedial. As did Jefferson County, Camden Fairview achieved unitary status, with this Court finding that it "reduced the test score disparity between black and white students within the district, and it has satisfied all other court ordered obligations, and is *hereby declared unitary in status*." Doc. 254 at 1, ¶ 2 (emphasis added). The settlement agreement incorporated by reference into the consent decree indicates no ambiguity or uncertainty on that point—Camden Fairview is unitary, with no finding that the district has any remaining vestiges of segregation requiring further remediation. Nor does the settlement agreement connect the transfer prohibition to any intended remedial effect. In fact, the settlement agreement declares that rather than being remedial, the sole purpose of keeping the transfer prohibition was "to prevent *future* 'white flight'" from Camden Fairview to Harmony Grove. Doc. 254 at 9–10 (emphasis added). In other words, by achieving unitary status, Camden Fairview, like Jefferson County, "had remedied the constitutional wrong that allowed race-based assignments," a

conclusion underscored by the stated purpose of the transfer prohibition as preventative rather than remedial.

Because the transfer prohibition in the 2002 consent decree is expressly non-remedial, Camden Fairview must satisfy strict scrutiny based on some other compelling interest. But *Parents Involved* forecloses that effort because no part of the opinion—whether the four-justice plurality or the Kennedy concurrence—permits a bald racial classification as a means to achieve some measure of diversity. The only conceivably permissible use of race in this context would be as part of a "nuanced, individual evaluation of school needs and student characteristics that might include race." 551 U.S. at 791 (Kennedy, J., concurring). But the race-based transfer prohibition at issue here lacks all nuance—it instead divides children by race and grants or denies them the right to transfer enjoyed by all other Arkansas schoolchildren on the basis of race. Rather than nuance, the 2002 consent decree imposes the sort of "crude measures" that Justice Kennedy decried in *Parents Involved*.

Such crude measures are now recognized as unconstitutional because they violate the Equal Protection Clause of the Fourteenth Amendment. And because the transfer prohibition in the consent decree is no longer permissible under the law, that change in circumstances warrants revision of the decree, satisfying the first *Rufo* element.

### B.3. The Court should terminate the transfer prohibition because its continued application is inequitable to Emma and other students subject to the restriction.

Justice Kennedy's fear is exactly what happened to Emma—she was reduced to a "racial chit valued and traded according to one school's supply and another's demand." Her transfer request would have been granted as required under Arkansas law had she been of any other race. But because she was white, the request was denied. That sort of crude, unnuanced awarding of rights and privileges on the basis of race cannot withstand strict scrutiny review. No compelling interest supports bald racial classifications of this sort. Nor is such a classification narrowly tailored. *See Parents Involved*, 551 U.S. at 726 ("[I]t is clear that the racial classifications employed by the districts are not narrowly tailored to the goal of achieving the educational and social benefits asserted to flow from racial diversity. In design and operation, the plans are directed only to racial balance, pure and simple, an objective this Court has repeatedly condemned as illegitimate."); *see also Teague*, 873 F. Supp. 2d at 1067–68 (concluding that Arkansas statute conditioning interdistrict transfers on the basis of rase was not narrowly tailored). The transfer prohibition thus violates the Equal Protection Clause of the Fourteenth Amendment.

And because the transfer prohibition violates the Equal Protection Clause, "applying it prospectively is no longer equitable" under Fed. R. Civ. P. 60(b)(5). Further application is no longer equitable because the transfer prohibition has become impermissible under federal law. Accordingly, the Court should terminate the transfer prohibition and direct Camden Fairview to consider the Castleberrys'

transfer request for Emma the same way that it would consider any other transfer request. Termination of the transfer prohibition satisfies the second element of the *Rufo* test because it targets a specific provision of the consent decree[4] that is no longer equitable under changed circumstances without affecting any other provision of the decree. *See Smith*, 769 F.3d at 573–74 (construing order modifying a consent decree as not terminating provisions unrelated to the changed circumstance). Indeed, termination of the transfer prohibition is the only available option because any other measure would leave an unconstitutional racial classification in place.

## IV. Conclusion

Much has changed since 2002, including the law governing whether school districts may make student assignment decisions based on the race of students. That change in the law makes continued enforcement of the consent decree's race-based transfer prohibition inequitable and requires terminating that unconstitutional racial classification. Termination of that provision is the only option to allow Emma and other students like her to exercise the statutory right held by all Arkansas schoolchildren to attend school in any district they choose.

[4] To be clear, the Castleberrys are not seeking a declaration of unitary status or dissolution of the entire consent decree. Camden Fairview has already been declared unitary, and the other provisions of the consent decree have not harmed the Castleberrys. Their harm extends solely from the transfer prohibition that the 2002 consent decree adopted.

Scott A. Irby (99192)
Gary D. Marts, Jr. (2004116)
WRIGHT, LINDSEY & JENNINGS LLP
200 West Capitol Avenue, Suite 2300
Little Rock, Arkansas 72201-3699
(501) 371-0808
FAX: (501) 376-9442
sirby@wlj.com; gmarts@wlj.com

*Attorneys for Jesse and Rachel Castleberry*